AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

WESTERN District of TEXAS

**FILED**

September 15, 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____Jackson_____
DEPUTY

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No.  SA-21-MJ-01046 |
| Aiden Robert Falkiewicz | ) |
| | ) |
| | ) |
| | ) |

_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  November 19, 2020  in the county of  Bexar  in the
Western  District of  Texas , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC 1001 | Knowingly and Willingly Made a False Statement to an Agent of the Federal Government |
| | PENALTIES: Up to 5 Years Imprisonment, Maximum Fine of $250,000, Up to 0-3 Years Supervised Release, and $100 Mandatory Special Assessment |

This criminal complaint is based on these facts:

See attached affidavit

☒ Continued on the attached sheet.

JAMES PHILLIPS
Digitally signed by JAMES PHILLIPS
Date: 2021.09.15 10:56:45 -05'00'

_Complainant's signature_

James Phillips, DEA Special Agent
_Printed name and title_

☐ Sworn to before me and signed in my presence.
☒ Sworn to telephonically and signed electronically.

Date:  September 15, 2021

_Judge's signature_

City and state:  San Antonio, Texas

Elizabeth S. Chestney, U.S. Magistrate Judge
_Printed name and title_

## AFFIDAVIT

1.   I, James Phillips, am a Special Agent with the United States Drug Enforcement Administration (DEA), and have been since November 1997.  I am currently assigned to the DEA San Antonio District Office and have been since 2002.  My responsibilities include the investigation of possible criminal violations of the United States Narcotics Laws (Title 21, United States Code), the Money Laundering Control Act (Title 18, United States Code), the Bank Secrecy Act (31 U.S.C. Section 5311, et. seq.), and related offenses. As a Special Agent of the DEA for approximately twenty-three years, I received extensive training at the U.S. Drug Enforcement Law Enforcement Training Center in Quantico, Virginia and other venues. This training covered all aspects of narcotics investigations. I have also attended professional training covering various aspects of financial investigations, including money laundering and asset forfeiture. I have personally directed or assisted in numerous narcotics and money laundering investigations. I have also participated in the execution of many search and/or seizure warrants on businesses, residences, vehicles, safe deposit boxes, computers and other electronic device.

2.   This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not

set forth all of my knowledge about this matter.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of **18 USC 1001** have been committed by **Aiden Robert FALKIEWICZ.**

3.    The information contained within this Affidavit is based upon information your Affiant has gained from his investigation, his personal observations, his training and experience, and/or information provided to your Affiant by other agents and other law enforcement officers.

4.    This affidavit is made in support of a criminal complaint for the arrest of **Aiden Robert FALKIEWICZ** (hereinafter referred to as "**FALKIEWICZ**") for violation of Title 18, United States Code, Section 1001, Knowingly and Willingly Made a False Statement to an Agent of the Federal Government. The facts set forth in this affidavit are based upon my personal knowledge, my training and experience, and information obtained during this investigation from other sources including: (a) other law enforcement officers; and (b) statements made or reported by witnesses with personal knowledge of relevant facts. This

affidavit is intended to show that there is probable cause for the requested complaint and arrest warrant, and does not purport to set forth all of my knowledge of, or investigation into this matter.

## SUMMARY OF THE INVESTIGATIONAND PROBABLE CAUSE

5.    During October 2020, a DEA Source of Information (SOI), provided information to the San Antonio District Office Tactical Diversion Squad (TDS) about an overdose death on October 20, 2020 in San Antonio, Texas to someone in a close relationship with the SOI.  Specifically, the SOI informed agents that a twenty-year old male named Garrett Richard JOINER passed away of an overdose of illegal pharmaceutical pills.  The SOI informed the agents that the SOI believed the source of the illegal pharmaceutical pills was a female named Jewel Leann STERRETT and that another male named **Aiden Robert FALKIEWICZ** was associated with the purchase of the illegal pharmaceutical pills from STERRETT.  The SOI believed JOINER and **FALKIEWICZ** obtained the pharmaceutical pills from STERRETT, prior to JOINER's overdose death.

6.    On December 2, 2020, the Bexar County Medical Examiner, D. Kimberly Molina, M.D., identified the cause of death for JOINER to be a Fentanyl overdose.  Specifically, the postmortem autopsy/toxicology final report by the Bexar County Medical Examiner, Dr. D. Kimberly Molina, concluded that Garrett JOINER

died as a result of the toxic effects of fentanyl.  Specifically, GARRETT's autopsy toxicology report findings determined that GARRETT's body contained .022mg/L of fentanyl.   No other controlled or toxic substances were detected. There was no evidence of significant trauma or natural disease that would have caused or contributed to death.

Fentanyl is a prescription opioid typically used for surgical anesthesia and severe chronic pain, with therapeutic plasma concentrations in the range of .002 to .005 mg/L and a potency of approximately 200 times that of morphine. The toxicology analysis revealed that JOINER's blood had an approximate amount of more than 44 to 110 times the amount needed for a therapeutic dose.

7.    On Thursday, November 19, 2020, S/A James Phillips and S/A Reed Esterak interviewed **Aiden Robert FALKIEWICZ** at his residence, located in San Antonio, Texas 78249.  **FALKIEWICZ** was a close friend of Garrett Richard JOINER and the only person with JOINER at the time of JOINER's overdose death from suspected illegal pharmaceutical pills on October 20, 2020 at a home located on Cranes Mill in San Antonio, Texas.

8.    During the interview with **FALKIEWICZ**, your affiant observed that **FALKIEWICZ** provided multiple false and untrue statements and information throughout the interview.  Your

affiant will detail the information provided by **FALKIEWICZ** and subsequently identify the false and untrue statements and information and describe why the statements are false and untrue.

9.   On November 19, 2020, at approximately 12:10 p.m., San Antonio Police Department patrol officer Ricardo Chapa arrived at **FALKIEWICZ'** residence and approached the front door with S/A Phillips.  Officer Chapa made contact with **FALKIEWICZ'** mother via the Ring Video Doorbell, who stated that she was not home.  Officer Chapa stated that he needed to talk with her son, **Aiden FALKIEWICZ**, and asked if **Aiden FALKIEWICZ** was at the residence.  His mother offered to call him, and Officer Chapa instructed her to direct **Aiden FALKIEWICZ** the front door.  A short time later, **Aiden FALKIEWICZ** answered the door and Officer Chapa informed **FALKIEWICZ** that he and S/A Phillips and S/A Esterak needed to talk with him.

10.   S/A Philips identified himself as a Special Agent with the Drug Enforcement Administration and that S/A Phillips and his partner, S/A Esterak, wanted to talk to **FALKIEWICZ** about the death of Aiden's friend, Garrett JOINER.  **FALKIEWICZ** followed S/A Phillips and Officer Chapa from the front door to the front yard area, at which time S/A Esterak joined the interview.  S/A Phillips and S/A Esterak observed **FALKIEWICZ** was shaking and acting very nervous.  Several times during the interview,

**FALKIEWICZ** contradicted his answers and provided false and untrue statements, including those detailed below.

11. S/A Phillips asked **FALKIEWICZ** if he could describe his knowledge of the events surrounding the death of JOINER. **FALKIEWICZ** stated that he and JOINER were working together at a landscaping company located on Stahl Road in San Antonio, Texas, the night prior to JOINER's death. **FALKIEWICZ** stated that JOINER was watching the house for JOINER's mother's boyfriend, while JOINER's mother and boyfriend were out of town. **FALKIEWICZ** acted very nervous and then immediately stated to agents that he (JOINER) handed **FALKIEWICZ** Ketamine. S/A Phillips asked **FALKIEWICZ** to take his time with describing the events and to explain the events in sequence as they happened. **FALKIEWICZ** then continued by stating that both **FALKIEWICZ** and JOINER left work at the same time and drove their cars separately from work to the home of JOINER's mother's boyfriend who was also the owner of the landscaping company for which they both worked. **FALKIEWICZ** next stated that JOINER handed him Ketamine. At this point in the interview, your affiant asked **FALKIEWICZ** to slow down and try to describe the events in more detail, because **FALKIEWICZ** began by describing working and then jumped to describing being handed Ketamine. **FALKIEWICZ** then began describing the events again, at which he stated that he and JOINER went straight from work to JOINER's

mother's boyfriend's house on Cranes Mill in San Antonio, Texas.
Once at the house, **FALKIEWICZ** stated to your affiant, "he put
that in front of me and was like dadadadada, we should do that
now". It was clear to your affiant that **FALKIEWICZ** was referring
to the "that" as the Ketamine **FALKIEWICZ** had just previously
described to your affiant. Your affiant asked **FALKIEWICZ** when
they arrived at the residence located on Crane's Mill after
work. **FALKIEWICZ** believed he and JOINER arrived at the residence
between 6:30 p.m. and 7:00 p.m. **FALKIEWICZ** explained to your
affiant that after Joiner suggested that they use the drugs, he
(**FALKIEWICZ**) told JOINER that he (**FALKIEWICZ**) needed to get
dressed and get clothes for work the next day. **FALKIEWICZ**
continued by stating that he and JOINER went to get clothes and
then **FALKIEWICZ** changed his statement by stating that only he
went to get clothes at his parents' house and then returned to
meet JOINER at the Cranes Mill. **FALKIEWICZ** stated that he was not
gone longer than 30 minutes. It is noted that **FALKIEWICZ'**
residence is approximately 2 miles from the residence on Cranes
Mill.

12. Your affiant later became aware that this statement by
**FALKIEWICZ** to be false and untrue. On 02-09-2021, your affiant
obtained a search warrant for the cellular telephone utilized by
**Aiden FALKIEWICZ** from the Honorable U.S. Magistrate Judge Richard
B. Farrer (SA-21-MJ-00168). An analysis of **FALKIEWICZ'** cellular

telephone identified that on October 19, 2020, between approximately 7:09pm and 7:20pm, **FALKIEWICZ'** cellular telephone was recognized by the cellular telephone tower located at 16850 Alamo Parkway, Selma, Texas.  This tower location is approximately 21 miles from **FALKIEWICZ'** residence and approximately 18 miles from the house where JOINER and **FALKIEWICZ** stayed together the night prior to JOINER's death (on Cranes Mill).  The cellular telephone analysis further identified that between approximately 7:20pm and 7:37pm, **FALKIEWICZ'** telephone was recognized by the cellular telephone tower located at 15520 Hill Lane, Selma, Texas.  This tower location is approximately 21 miles from **FALKIEWICZ'** residence and approximately 18 miles from the house that JOINER and **FALKIEWICZ** stayed at together the night prior to JOINER's death (on Cranes Mill).  At 7:56pm, **FALKIEWICZ'** cellular telephone was recognized by the cellular telephone tower located at 608 Kerlick Lane, New Braunfels, Texas.  This tower location is approximately 35 miles from **FALKIEWICZ'** residence and approximately 32 miles from the house that JOINER and **FALKIEWICZ** stayed at together the night prior to JOINER's death (on Cranes Mill).  At approximately 8:01pm, **FALKIEWICZ'** cellular telephone was recognized by the cellular telephone tower located at 6959 FM482, New Braunfels, Texas.  This tower location is approximately 26 miles from **FALKIEWICZ'** residence and approximately 23 miles from the house that JOINER and **FALKIEWICZ**

stayed at together the night prior to JOINER's death (on Cranes Mill). Between approximately 8:10pm and 8:28pm, **FALKIEWICZ'** cellular telephone was recognized by the cellular telephone tower located at 16850 Alamo Parkway, Selma, Texas.  This tower location is approximately 21 miles from **FALKIEWICZ'** residence and approximately 18 miles from the house that JOINER and **FALKIEWICZ** stayed at together the night prior to JOINER's death (on Cranes Mill). At approximately 8:36pm, **FALKIEWICZ'** cellular telephone was recognized by the cellular telephone tower located at 17195 FM 2252, San Antonio, Texas.  This tower location is approximately 25 miles from **FALKIEWICZ'** residence and approximately 22 miles from the house that JOINER and **FALKIEWICZ** stayed at together the night prior to JOINER's death (on Cranes Mill). At approximately 8:55pm, **FALKIEWICZ'** cellular telephone was recognized by the cellular telephone tower located at 13451 Wetmore Road, San Antonio, Texas.  This tower location is approximately 11 miles from **FALKIEWICZ'** residence and approximately 10 miles from the house that JOINER and **FALKIEWICZ** stayed at together the night prior to JOINER's death (on Cranes Mill). At approximately 10:59pm, **FALKIEWICZ'** cellular telephone was recognized by the cellular telephone tower located at 17474 E. Judson Road, San Antonio, Texas.  This tower location is approximately 14 miles from **FALKIEWICZ'** residence and approximately 14 miles from the house that JOINER and **FALKIEWICZ**

stayed at together the night prior to JOINER's death (on Cranes Mill). Between approximately 12:03am and 11:55am on October 20, **FALKIEWICZ'** cellular telephone was recognized by the cellular telephone tower located at 12720 NW Military Road, San Antonio, Texas.  This tower location is approximately 2 miles from **FALKIEWICZ'** residence and approximately 2 miles from the house that JOINER and **FALKIEWICZ** stayed at together the night prior to JOINER's death (on Cranes Mill).

13.  Once back with JOINER, **FALKIEWICZ** stated that JOINER suggested that they both get something to eat.  **FALKIEWICZ** stated that they then went to get food.  **FALKIEWICZ** seemed confused about describing the events and asked if he should describe what happened again at the house.  **FALKIEWICZ** stated that once at the residence the first time that night, he and JOINER sat outside on the patio chairs.  **FALKIEWICZ** continued by stating that JOINER then offered drugs and suggested that **FALKIEWICZ** and JOINER should use the drugs.  Your affiant asked **FALKIEWICZ** where JOINER retrieved the drugs from when offering them to **FALKIEWICZ** and **FALKIEWICZ** stated he had no idea.  Your affiant asked **FALKIEWICZ** if **FALKIEWICZ** observed JOINER retrieve the drugs from his (JOINER's) pocket, **FALKIEWICZ** stated he had no idea.  Your affiant asked **FALKIEWICZ** what he and JOINER did when the drugs appeared from JOINER. **FALKIEWICZ** said he was confused and didn't understand the question.  **FALKIEWICZ** eventually understood the

question and stated that he (**FALKIEWICZ**) used his drugs and
JOINER took his (JOINER's) drugs.  **FALKIEWICZ** then stated that he
(**FALKIEWICZ**) fell asleep and woke up in the morning.

14.  Since **FALKIEWICZ** seemed very elusive and provided
contradicting statements, your affiant asked **FALKIEWICZ** to
clarify the times when **FALKIEWICZ** traveled to his parent's
house.  **FALKIEWICZ** proceeded to state that he traveled to his
parent's house for clothes and returned to JOINER's residence
around 9:00 p.m.  **FALKIEWICZ** stated that he and JOINER were
hungry so they traveled together in **FALKIEWICZ** vehicle and
purchased food from Mama Margie's restaurant, via the drive-thru
lane.

15.  **FALKIEWICZ** stated to your affiant that he didn't use
pills, not even ibuprofen.  **FALKIEWICZ** became very nervous and
struggled to explain using the drugs. **FALKIEWICZ** stated that he
(**FALKIEWICZ**) took a Ketamine horse pill.  **FALKIEWICZ** stated that
JOINER told **FALKIEWICZ** since they ate, **FALKIEWICZ** should wait to
take the drugs. **FALKIEWICZ** state that JOINER used his drugs and
JOINER was going out of it and told **FALKIEWICZ** to take his drugs.
**FALKIEWICZ** stated that he and JOINER then took their
pills.  **FALKIEWICZ** stated that he took a Ketamine "triosh"
pill.  Your affiant asked **FALKIEWICZ** what "triosh" meant and he
stated it was dissolvable.  **FALKIEWICZ** told your affiant that he
didn't understand how it dissolved and he asked

JOINER.  **FALKIEWICZ** stated the last thing he said to JOINER was
how does the drug dissolve and was he supposed to swallow
it.  **FALKIEWICZ** described the Ketamine pill as a square and off-
white horse pill. **FALKIEWICZ** stated that he took half of the
Ketamine pill.

16.  **FALKIEWICZ** stated that JOINER took a morphine
pill.  When asked how **FALKIEWICZ** knew what type of pills each
used, **FALKIEWICZ** stated that JOINER informed **FALKIEWICZ** what the
drugs were. **FALKIEWICZ** stated that at this time with JOINER,
everything goes out the window for **FALKIEWICZ**.  **FALKIEWICZ** stated
JOINER seemed like he was sleeping and after the drugs that
**FALKIEWICZ** took started working, he was just gone. **FALKIEWICZ**
stated he was not functioning and that he and JOINER watched
television and eventually fell asleep in their patio chairs.

17.  **FALKIEWICZ** continued by stating that the next thing he
remembered was waking up about five hours later and calling his
mom because JOINER was dead.  **FALKIEWICZ** stated he slept through
the night and woke up at 5:30a.m.  Your affiant asked **FALKIEWICZ**
how he knew JOINER was dead and **FALKIEWICZ** stated that he woke up
and went to the bathroom.  When **FALKIEWICZ** returned to the patio,
he stated that JOINER was quiet and did not move and he realized
that JOINER was not alive.  **FALKIEWICZ** stated that he then called
his mother, Christina **FALKIEWICZ**, from his cellular
telephone.  **FALKIEWICZ** stated that his cellular telephone was low

on a charge.  **FALKIEWICZ** stated at some point he called EMS from
JOINER's cellular telephone (via emergency call option) and was
instructed to move JOINER from his chair and begin chest
compressions.  **FALKIEWICZ** stated that he continued to conduct
chest compressions on JOINER until EMS arrived.

18.  Based on the analysis of the cellular records of
**FALKIEWICZ**, your affiant identifies that **FALKIEWICZ** was clearly
not in proximity of his home or even in San Antonio between 6:30
p.m. and 7:00 p.m. on October 19, 2020, nor was **FALKIEWICZ** anywhere
near the Crane's Mill residence as he falsely stated. The
cellular records analysis identify that **FALKIEWICZ** was not
anywhere near his own residence or the Crane's Mill residence
until approximately 12:03am on October 20, 2020.  It is noted
that JOINER was pronounced deceased by San Antonio first
responders at approximately 6:08am on October 20, 2020. A review
of cellular telephone records indicate that **FALKIEWICZ** placed a
call to his mother, Christina Falkiewicz, at approximately 5:52am
for approximately 3 minutes and 23 seconds.  Records from the San
Antonio Police Department (SAPD) calls for service data also
indicate that **FALKIEWICZ** placed a call to the SAPD at 5:58am

19.  **FALKIEWICZ** further stated that they should eat before
doing this (use the drugs) Specifically, FLAKIEWICZ stated to

your affiant "I would say, I left at 8:30 and was like I'll get back here at 9:00 and tried to rush is exactly what happened".

20.  Your affiant later became aware that this statement by **FALKIEWICZ** to be false and untrue.  Based on the analysis of the cellular records of **FALKIEWICZ**, your affiant identifies that **FALKIEWICZ** was clearly not near the area of the Cranes Mill residence or the Mama Margie's restaurant around 9:00pm on October 19, 2020 to go buy food with JOINER, as he falsely stated. Records identify that **FALKIEWICZ** was approximately 10 miles from the Cranes Mill residence at that time.

21.  During the interview, **FALKIEWICZ** was then asked where the drugs/pills came from.  **FALKIEWICZ** responded, "I know where he got it, yes".  **FALKIEWICZ** was asked how he knew where JOINER got it and what he said and **FALKIEWICZ** responded, "It's a 'plug'".  When asked what **FALKIEWICZ** meant by 'plug', **FALKIEWICZ** stated "like a normal person would do to buy drugs from, like just a normal dealer".  **FALKIEWICZ** stated that JOINER had a person that JOINER bought from for a long time and then that guy was out of weed one day.  So, JOINER asked him if he had somebody else he could buy from.  **FALKIEWICZ** stated that he only knew the drug 'plug' Snapchat username as "210oil".  **FALKIEWICZ** claimed that "210oil" was out at some point and passed another 'plug' to JOINER.  **FALKIEWICZ** stated, "I don't know the guy in the middle, I have no clue who he is". "I don't

know the next guy, and then the one after that her name is like
schools like a 'z', like schoolz shop".

22.  **FALKIEWICZ** stated that he was aware that this new
'plug' used the Snapchat username "jewelbearss" and display name
"SKOOLZ".  **FALKIEWICZ** offered to show your affiant
who "jewelbearss" and display name "SKOOLZ" was.  **FALKIEWICZ** was
able to show agents "jewelbearss" and display name
"SKOOLZ" Snapchat from **FALKIEWICZ'** cellular telephone, which
identified a female in pictures and videos with drugs.  When
asked why **FALKIEWICZ** had the Snapchat pages of "jewelbearss" and
display name "SKOOLZ", he stated that JOINER gave them to
**FALKIEWICZ**.  When asked why **FALKIEWICZ** had the "jewelbearss" and
display name "SKOOLZ" Snapchat on his phone, **FALKIEWICZ** stated he
had no reason to remove it.  **FALKIEWICZ** struggled to answer the
question and stated that he was fearful of "jewelbearss" and
display name "SKOOLZ" because of social intimidation.  Agents
asked **FALKIEWICZ** if "jewelbearss" and display name "SKOOLZ" has
ever made any threats to **FALKIEWICZ**, to which he answered no.
**FALKIEWICZ** elaborated that he feared only the fact that
"jewelbearss" and display name "SKOOLZ" provided the pill that
killed him JOINER, but he otherwise had no other reason to fear
"jewelbearss" and display name "SKOOLZ". **FALKIEWICZ** provided no
additional information as to why he believed that the person

described by **FALKIEWICZ** as "jewelbearss" and display name "SKOOLZ" provided the pills that killed JOINER.

23.   **FALKIEWICZ** stated that he could confirm at least one time that JOINER received the drugs from "jewelbearss" and display name "SKOOLZ".  **FALKIEWICZ** believes that JOINER received drugs from "jewelbearss" and display name "SKOOLZ" more than once.  **FALKIEWICZ** stated that he believes that it took about two weeks to obtain a new 'plug' ("jewelbearss" and display name "SKOOLZ") that was able to provide drugs/pills.  **FALKIEWICZ** stated that he believed JOINER went to pick up the Ketamine and morphine drugs/pills from "jewelbearss" and display name "SKOOLZ" that each used prior to JOINER's death.

24.   Based on the analysis of the cellular records of JOINER's telephone and the analysis of the search warrant records of **Aiden FALKIEWICZ'** cellular telephone, your affiant identified that this statement by **FALKIEWICZ** to be false and untrue.

**Garrett JOINER'S Consensual Cellular Telephone Analysis**

25.   On October 27, 2020, the previously mentioned SOI provided your affiant with the cellular telephone utilized by JOINER prior to his overdose death, your affiant identified the following:

26.   On October 9, 2020, JOINER communicated, utilizing his iPhone and the messaging application Snapchat, to Jewel STERRETT,

utilizing the Snapchat username "jewelbearss" and display name "skoolz $".  During this communication, STERRETT posts "I get prescribed troches".   JOINER responds by posting "Absolutely, take your time.  Family first, just hit me back when you can.  I'm looking to buy a good amount if it's prescribed ket" and "Alright will do" and "This is going to be him, just so you know" Your Affiant notes that last post by JOINER included a cartoon graphic of a white male with the name **'Aiden'** and the Snapchat username "**aidenfalk24**" and display name "**Aiden**".

    27.  On October 11, 2020, STERRETT responds with her post of "2555 ne loop 410 building 24 apt 2404 2nd floor #1256".

    28.  On October 15, 2020, JOINER posts "Can I get (8) Morphine 30s, (2) Morphine 100s and (6) Tramadol".  STERRETT responds with post "2555 ne loop 410 building 21 apt 2110 #1256".  On October 17, 2020, JOINER posts "Those percs got me feeling fucking great, thank you again".

    29.  Your affiant analyzed the cellular telephone records of **FALKIEWICZ** and identified between October 13-16, 2021 **FALKIEWICZ'** telephone was recognized by the cellular tower multiple times near the apartment residence provided by STERRETT to JOINER, as the pickup location for the drugs JOINER ordered.  Specifically, JOINER informed STERRETT that **FALKIEWICZ** would be coming to get the narcotics.  The text by JOINER to STERRETT is displayed as "This is going to be him, just so you know."  Your Affiant notes

that last post by JOINER included a cartoon graphic of a white
male with the name **'Aiden'** and the Snapchat username
"**aidenfalk24**" and display name "**Aiden**".

### Aiden FALKIEWICZ' Search Warrant Cellular Telephone Analysis

30.  October 12, 2020, **FALKIEWICZ** communicated, utilizing
his iPhone texting function from his cellular telephone **210-548-
1032**, to JOINER.  During this communication, **FALKIEWICZ** states,
"my bong still on the floor in pieces.  I told my mom abt it.  I
used a broken broom head to sweep and left it on top, that's why
I was late to work today".

31.  October 15, 2020, **FALKIEWICZ** communicated, utilizing
his iPhone texting function from his cellular telephone **210-548-
1032**, to JOINER.  During this communication, **FALKIEWICZ** states,
"i just experienced another park thief, her ketamine is going to
get cheap as shit".  JOINER replies, "Yeah she told me that last
time.  But why did you say that".  **FALKIEWICZ** replied, "her
story, lol u the only one that bought them.  Her acid is good.
Letting u know".  JOINER replies, "How do you know lol.  Before u
ever try to take more than one".  JOINER replies, "And also
that's the same pic she posted 5 days ago".  **FALKIEWICZ** replies,
"Oh true".  JOINER replies, "Why did you try it tonight".
**FALKIEWICZ** replies, "Bored".  JOINER replies, "Are you having
fun.  How many did you take, hopefully just 1".  **FALKIEWICZ**

replies, "Nah yeah, Started, Feels like a lot, Like a whole assload of a lot".  JOINER replies, "Lol that's good.  Good thing they won't be there tmrw".  **FALKIEWICZ** replies, "That was the idea with it But I'm kinda trippin trippin".  JOINER replies, "What time did you take it, I guess it's still early enough.  Try to get some sleep though".  **FALKIEWICZ** replies, "Like an hour ago".  JOINER replies, "And drink lots of water".  **FALKIEWICZ** replies, "No I'll be good.  Yessir".  JOINER replies, "I know, just so you feel better tomorrow.  Hope you have a good trip".

**FALKIEWICZ** replies, "What ru going to be doing lmao, But I will". JOINER replies, Nothing just playing xbox for a bit then bed, I'm staying over at their house tonight.  Also dabbing heavily".

**FALKIEWICZ** replies, "currently what i'm tryna do, i'm struggling, good stuff".  JOINER replies, "Lol that's good, Strong visuals?"

**FALKIEWICZ** replies, "will be yeah lol, or just about are, honestly, no".  JOINER replies, "Really?/: That's weird"

**FALKIEWICZ** replies, "trip anxiety WAS INSANE JUST NOW, I dabbed i'm good lol, nah, got real good".  JOINER replies, "Lol that's good.  Usually peaks around 2 hours for me".  **FALKIEWICZ** replies, "i'm just chillin here with my parents".  JOINER replies, "Wait what, Like do they know".  **FALKIEWICZ** replies, "yeah like it's good, idk, my b i'm like trippin trippin".  JOINER replies, "Are you good".  **FALKIEWICZ** replies, "yessir".

32.    October 16, 2020, your affiant was able to determine based on the analysis of the downloaded records of JOINER's cellular telephone that **FALKIEWICZ** traveled to Dallas, Texas from October 16 through October 19, while utilizing his cellular telephone **210-548-1032.**  **FALKIEWICZ** and JOINER continued to communicate during this travel time, to include communications about illegal drug activity.  JOINER texts **FALKIEWICZ** "Please hide your shit before something happens".  **FALKIEWICZ** replies, "it is".  JOINER replies, "Just make it so your car doesn't smell.  So no probable cause.  Drive w windows down and shit'.

33.    October 18, 2020, **FALKIEWICZ**, while utilizing his cellular telephone **210-548-1032**, texts JOINER "we're supposed to hang out and get wax from one of her friends and we haven't fucking started.  We're actually getting drug so i'm less mad".

34.    October 19, 2020, JOINER communicated, utilizing his iPhone texting function, to **Aiden FALKIEWICZ**, displayed in text as "**2105481032 Aiden FALKIEWICZ**".  During this communication, **FALKIEWICZ** states he returned to San Antonio from his Dallas trip.  **FALKIEWICZ** texts JOINER "if u wanna dab?".  JOINER replies, "Nah I'm way too tired lol.  Tomorrow though".  **FALKIEWICZ** replies, "I got 33gs of prime dallas shatter".  Your affiant is aware that "shatter" refers to a type of marijuana extract of a specific texture of translucent cannabis concentrate that breaks and shatters like glass.  JOINER replies, "Let's for

sure do it tmrw".  At approximately 6:21pm, JOINER texts
**FALKIEWICZ** with the address to the residence of his mother's
boyfriend, where JOINER was house sitting while his mother and
her boyfriend were out of town in Colorado  "REDACTED Cranes
Mill".   At approximately 6:45pm, **FALKIEWICZ** replies "am here".
At approximately 8:03pm, **FALKIEWICZ** replies again, "am here".  At
this time, **FALKIEWICZ'** phone was using a cellular phone tower in
New Braunfels, Texas.  At approximately 9:32pm, **FALKIEWICZ**
replies, "do I swallow it when it's gone".  At approximately
9:34pm, **FALKIEWICZ** texts JOINER "Am I gonna end up spitting this
out".  JOINER immediately replies "no".  "In the end it should
all dissolve".  **FALKIEWICZ** replies, "and then swallow?".  JOINER
replies, "Yeah".  **FALKIEWICZ** replies, "when it's gone i swallow".
JOINER replies, "What's up".  This was the last identified
communication between JOINER and **FALKIEWICZ** discovered from the
analysis of JOINER's cellular telephone.  During this text
conversation, **FALKIEWICZ'** cellular telephone was utilizing a
cellular phone tower approximately 11 miles from the Cranes Mill
residence and approximately 10 miles from **FALKIEWICZ'** residence.

35.  **FALKIEWICZ** also stated during the interview that he and
JOINER both took their narcotics while they were together at the
12735 Cranes Mill residence.  However, your affiant knows this
statement by **FALKIEWICZ** to be false and untrue. The analysis of
the cellular records above for JOINER and **FALKIEWICZ**

unequivocally identified both communicated with each other via their cellular telephones- NOT IN PERSON.

36.   Based on my training and experience, your affiant concludes that **Aiden FALKIEWICZ** knowingly and intentionally provided materially false and untrue statements and representations to your affiant and others during the interview of **FALKIEWICZ** on November 19, 2020 surrounding his knowledge and his criminal activities leading up to the Fentanyl overdose death of Garrett JOINER on October 20, 2020, an investigation of which I and others are conducting for and on behalf of the Drug Enforcement Administration, an agency with authority and jurisdiction to conduct investigations of this nature.

37.   Your affiant submits that there is probable cause to believe that **Aiden Robert FALKIEWICZ** committed violation of Title 18, United States Code, Section 1001, Knowingly and Willingly Made a False Statement to an Agent of the Federal Government.

JAMES PHILLIPS   Digitally signed by JAMES PHILLIPS
Date: 2021.09.15 10:57:34 -05'00'
_____
James Phillips, Special Agent
U.S. Drug Enforcement Administration


Sworn and Subscribed to me this 15th day of September 2021

_____
Elizabeth S. Chestney
United States Magistrate Judge
Western District of Texas
San Antonio Division